The first case on for argument is United States v. Randall. Argument of appeal, I should say. Good morning. Good morning, Your Honors. May it please the Court. I would like to begin, Your Honors, just by noting that I tried this case with John Heumann, a legendary figure in the Western District of New York in Buffalo. John passed away yesterday, and I just wanted to mention for the record that we're thinking of him. Of course, I've got some very large shoes to fill here in John's presence. Our client in the case was Carl Randall. Carl is about 5'7". He's almost 60 years old at the time of the offense. He's raised by a single mother. He's got seven siblings. Lived all over. Lived in St. Louis. Lived in Georgia. Lived in Indianapolis. Lived in Buffalo. Trying to find a place for himself in the world. Gets his GED and joins the Army in 1975. So that's why he's permitted to be at the VA hospital in Buffalo in May of 2016. He's there because he's having some nightmares. He's looking to get some treatment. And, in fact, Mr. Randall is in a good mood that morning. Comes out of the restroom. And this brings me to the point, judges, that you know there's a video of this event. And that's pretty unique. So what he does is he says hello to a good-looking young lady. And we know kind of what develops from there, Your Honors, because you've seen the video, I'm sure. And the case is unique for that reason. The case is unique because there's a video. The case is unique also because you get to review the record in the light most favorable to the defendant. And that's pretty a rare thing. This court knows that there's two issues before it. I'd like to focus on the issue about the jury instruction, whether or not Carl Randall was entitled to a jury instruction as to the justification defense. So there is a video. There's two things I'd like to address with respect to the video. The first is what I believe to be a factual inaccuracy that was kind of perpetrated both before the jury and before this court. And that is that Carl Randall pulled this BB gun when Lakeisha Hughes' back was turned. I'd ask you to examine the video again, if Your Honors aren't so inclined. Wasn't she moving away? Even if her back was turned, wasn't she moving away when he took the gun out? My viewing of the video suggests that she is fixing her coffee. She's already approached him once kind of aggressively, back to fixing her coffee. As you know, Carl's standing in line. And she's about to come. She turns around and is about to come back towards Carl. And it's at that point that the weapon is pulled out. It reminds me, Judge, you know, we've kind of argued this back and forth now because, as you know, we've been in front of the district court, too, that it reminds me of a great line from To Kill a Mockingbird, which is that people see what they look for. And maybe both parties are a little bit guilty of that. But I think if you examine the video closely, you are going to see that she turns around, and it's only when she's in the act of turning around again, in our position, obviously, that Carl is afraid at that point that the BB gun comes out of the pocket. The other thing that I'd like to address with respect to the video is the size difference. This is actually relied on by Judge Arcaro in affirming Judge McCarthy's order. Nothing in the record to support a belief that Carl is a larger or substantially larger figure than Lakeisha Hughes. You can see the video again for yourselves. Carl is no bodybuilder. He's not a very big man. I don't think that there's anything to support. And I've scoured the record to find something that says that Carl is such a much larger figure that that should be a reason that he can't be afraid of Lakeisha Hughes coming after him. Is there any question that this is non-deadly force? I don't think so. I don't think so. First of all, it's a BB gun, Judge. And second of all, he doesn't use the thing. Right? I mean, that was going to be one of my He doesn't point it or cock it. He just holds it by his side. Exactly right. Yeah. He just shows it, basically. And there are New York cases about that sort of thing. There are several. Yes, Judge. Yes. And is it your contention that New York law should govern this issue under the Assimilative Crimes Act? Well, yes. And I don't know if it makes much of a difference to be perfectly honest. It's probably not that much different. And the New York case law is not exactly crystalline. It is not. It is not. And, you know, the standard is maybe that's because it's such a factual inquiry, whether Carl is scared enough to believe the physical force is coming his way in order to react in a way that he did. And that's a factual kind of inquiry. There's not much proof in the record on that. There's a post-arrest statement. I mean, you know, looking at the subjective side of things, there's a post-arrest statement in which he speculates that maybe she has a gun or a knife on her. But that's total speculation. It is. It is speculation. But, you know, again, Judge, you have to review the evidence, as you know, and alight most favorable to the defendant. And from the beginning, in fact, I was there at the trial, and I argued personally to Judge McCarthy that it's not about exactly what he said. It's about viewing it in alight most favorable to Carl, which is that maybe she had a gun. Maybe she had a weapon. I don't know. I was scared. You know, he doesn't say those words, but I think that's a reasonable inference. There's no testimony in the record to that effect, is there? No, absolutely not. But I think that's a reasonable inference. He's asked, why did you do this? And his response is, well, maybe she had a gun, maybe she had a weapon. And I think that's a reasonable inference to make that, you know, basically I was scared. So I didn't know what to do. Why is that? I mean, what I'm struggling with is why is that a reasonable inference? Why? What's the basis for that other than pure speculation? Well, she comes after him first. I think in context, right, he's actually in a good mood. He's being friendly. I think that we both parties can agree that maybe he makes a pass at a young, attractive girl, and she's kind of in a bad mood. She's kind of belligerent, right? And if you look at the evidence in the light most favorable, again, to the defendant, there's testimony to Capri Orr. There's only three fact witnesses in the case, right? Capri Orr is one of the witnesses, and she says that Lakeisha Hughes was belligerent. She was ballistic. But she also says that she did not hear anything that resembled a threat coming from Ms. Hughes. No verbal threats, yes, Judge. But our submission is that maybe it's a different case if she hadn't first got into his personal space. This happens. He doesn't pull the BB gun upon the first time that Lakeisha Hughes moves from her position and kind of aggressively into Carl's personal space, right? He only, again, it comes back to how you're going to view the video, but he only pulls the weapon upon that second time. So it's in the context of her already having approached him. She goes back to fixing her coffee, and she's coming back again. And the other fact witness was Terry Lee Saunders who said, all Carl said was, hey, don't be cussing at me. Don't be cussing at me. And that caused Lakeisha Hughes to turn around from her coffee place, and it looked like to me that she, and I think a jury could conclude, that she was going to go back and maybe do something physical to Carl. And what's really interesting in all this, we're talking about a justification case, a self-defense case. Nobody got hurt, right? There's no injury. All that happened was a BB gun pulled out, brandished, as the court said. But there's no question that absent some justification defense, the evidence here amply proves menacing under New York law. Yes, Judge. The New York statute says it doesn't have to be a real gun. Anything that looks like threatening someone in any way with what looks like a real gun, it's not the crime of the century, but it is a misdemeanor under New York law. It is, Judge. And the defense to that is obviously that he was pulling the gun because he was scared. Interesting point that the government can prove his state of mind through inference, his state of mind that he was intending to scare Lakeisha Hughes. But we're not really allowed to get into that, either in jury instructions or in opening statements, as to why he would, you know, in fact, he pulled the BB gun because he was trying to scare her. That's actually the defense, right? And we're kind of cut off at the knees because we're not allowed to argue that. Well, with respect to the opening issue, I realize you're not arguing it. It doesn't mean that you're waiving it. But isn't it moot either way? That is to say, if you prevail on the jury instruction issue, you get a new trial. And unquestionably, if we say on this record there is enough to warrant a jury instruction, you're obviously allowed to argue something that would be an available defense for the jury. And on the other hand, if you fail to prevail on the instruction issue, you can argue that you should have been allowed to open on something that at the end of the day you wouldn't have been allowed to present to the jury anyway. There's no prejudice then. So isn't this all about the jury instruction, this case? I suppose perhaps it is, Judge. But the one thing that I would like to note to that is Judge McCarthy, I think, did make what amounts to a blanket ruling that you have to testify in order to present the self-defense. Well, but the judge went back and forth, and by the end of the trial said, well, that wasn't really right, that it could be inferred from the circumstances but just held that the other evidence was not sufficient. And that's either right or wrong. Right, Judge. Did anyone tell Judge McCarthy before the trial when there was this issue about what was going to be able to be said in the opening, did anybody tell Judge McCarthy that there was a post-arrest statement that the defendant was going to be trying to introduce in which the defendant said that he was concerned that she might have a gun or a knife? I believe that the judge was aware of it. You know, this all transpired in the course of about a day and a half. The pretrial conference was on the 13th and trial began on the 19th, and I believe he was made aware of that beforehand. And that would have been the evidence proved? That would have been part of the evidence as to his subjective post-arrest statement, and the video itself, which we contend a jury could have inferred, as it does in many cases, that he was scared and he was acting out of self-defense. Well, the jury got to see the video. They got to see the video, but they didn't get, obviously, the instruction. Right, right. Okay. Thank you. Thank you, Mr. Bagley. Ms. Baumgarten. Good morning, Your Honors. Mary Catherine Baumgarten for the United States. If I can direct the court's attention to the joint appendix at 89, that's where the argument is concerning the subjective component and what the defendant thought was reasonable, as he would have to have his burden to demonstrate that. And specifically what Mr. Heumann argues to the court is that there's a bit of back and forth, as the court notes. This issue was looked at several times, not only pretrial, but during the course of the trial, the judge revisits it several times. But the defense counsel specifically says that we have the film and witnesses. There's no specific reference or proffer with respect to the defendant's post-Miranda admission, his statement. And quite frankly, that should have been objected to at the time of the trial. I sat second chair. It was a line assistance first trial. We have a practice generally that that person who's doing the presentation, you don't have all of us jumping up and down. But once again, I say that that's specifically that, if I may. Well, it would be an interesting question, right? Because didn't the government offer aspects of that statement? Or did it not? We did. That is, the post-trial statement had incriminating portions. We did. So there would be a completeness argument that would be made. Now, I think you're right that an objection could have been, should have been made by the government if the government wanted to keep this out. That the self-serving part is hearsay. But then there would be a completeness argument available on the other side. And that feels to me like something that whatever a district court decided on that would be very unlikely to be reversed as a matter of law by us. And since it wasn't presented to the district court, it's in the record. The jury was not given any limiting instruction. They were fully entitled to consider it, right? Yes. And, you know, I think that bears emphasizing. The jury heard a lot in a day and a half. It was a pretty fast trial. What evidence was out there was out in front of the jury. They saw the size differential. Right. But how could they? But doesn't that cut the other way? They saw all this evidence. What does that mean if they weren't given an instruction as to what the law is? You know, if they saw all the evidence, very possibly they would have said this is ridiculous. That there was a self-defense issue here. We don't think that the woman was being threatening. Return a verdict of guilty. But they didn't, they weren't told that this was a possibility. So whether they got all the evidence or they didn't get all the evidence, the argument is they didn't get the jury instruction. It comes down to a fundamental premise. The government's position on this is, is there's absolutely no evidence in the record whatsoever that the defendant was scared. The only evidence. Well, but can't a jury, I mean, if, suppose he didn't take the stand, and all the evidence was the same except that the video showed Mizzou's coming at him with a knife, would you still be saying there's no evidence of his subjective state of mind? Different fact pattern. Different fact pattern. Yes, absolutely. Because the jury could infer from that that a reasonable person would have been frightened by that. Correct. I'm assuming she might have retreated. I don't know. I agree. Changing the facts in that way would absolutely have changed from an oral or verbal fight to he brings a gun to an oral or verbal fight. I understand. But the issue you're pressing is there was no evidence of his subjective state of mind, not an argument that if he had said he was scared, no reasonable jury could believe that or no reasonable jury could think it was reasonable for him to be scared. Because there was no proof. Exactly. But why couldn't the jury infer that he was scared? By the fact that he said he didn't know whether she had a knife or a weapon. When someone says, I didn't know what was going to happen, I didn't know she didn't have a gun, that doesn't indicate a jury couldn't infer from that kind of statement that he was worried that she did? Well, when you look at it from that little bit, yes. But the other evidence in this case, all of the other witnesses, including the witness called by the defense, he said he was scared. He said he was scared of the defendant. Of the gun. Yes. Of the defendant. No threats, no . . . Yes, she used very bad language. We don't see it or we don't hear it on the video because it's a silent video. Everybody absolutely says that she is cussing at him terribly. Right, but it's an important point that we don't hear any sound. When you look at a silent video, you have one kind of experience, which is just about what direction is she moving, what is she facing, what kind of gestures is she making. If you had the sound, you wouldn't just be hearing dirty language. The jury would be able to assess whether it was loud, whether it was belligerent, whether it was frightening. We don't have that. We just have the witness's testimony. But the witness's testimony is she was ballistic. I guess the question is, if the jury hears that a person is being approached aggressively by somebody, getting in his face, turns around and comes back after first backing away, and is approaching aggressively, is he concerned that he would be the victim of some kind of assault? Would a reasonable person be concerned about that? Why isn't that something that a jury should decide, whichever way they decide it? Because they saw the video, and the government's position on the video differs. Of course it does. That's the whole point. There's a dispute. Why should the jury— She was retreating. Our argument has always been that she was retreating, and her testimony was consistent with that, that I was retreating and when the gun—and she goes at length during the cross-examination to explain why she went to the gun based on her military training, that she thought that was her— she didn't want to get shot in the back. And every single person who looks at that firearm, it's not—you know, everybody was afraid. She's not the only one. But she's supposed to be afraid, right? That's his whole purpose. If it's self-defense, that's the whole point, is to frighten her and not have her attack him. That was his intention. That was exactly his intention, was to frighten her because, in her words— unless he was justified in trying to frighten her away because he was frightened that she would assault him. Do you agree this is non-deadly force, by the way? Yes. Yes. So the only question—the question of he needed to worry that she was going to kill him, that's not really in the case under either federal law or New York law. This is equivalent to if he pushed her away. Correct. And the judge actually, at one point, when they're discussing exactly this balancing and what one of the many times the magistrate looks at the evidence, he talks about that. And he, who listened to all of the witnesses, saw how they testified, saw the video, balanced all of it, made a finding that he didn't make a blanket finding once. He kept revisiting through the course of the trial. And the district court did the same thing, looked at those same set of circumstances and said, you haven't met your burden of establishing that your fear is reasonable, the subjective part of it. I mean, I agree, we totally disagree with regard to whether or not—we don't disagree that she approached, I believe it's twice, that she approached him twice, and she is cussing like a son of a gun because he continues to get into her space. It is what it is. I'm not going to go after the victim. There was part of it that did happen at the trial because she was homeless and all the other myriad of things that happen to you when you end up going to go to the wellness to try to get housing. I mean, that's the back story on the whole situation, and all of that came out. It all did at the trial. My point on all of this is that judges who listened to the testimony and the witnesses and how they presented in a very thoughtful manner, not a one and done, I'm going to reject this because he's huge and she's little. There is a discussion, the magistrate talks about it. He says, I observed her testify. She's not 160 pounds or whatever. The defendant, there's calls, and I'm not sure that that has been highlighted for the court. There's calls while he's incarcerated where he's bragging about bringing a nine millimeter in, which is interesting because that's exactly what the sergeant says, that he's got to pop the clip where the defendant has hidden the BB gun in the organ up in the prayer room or the chapel to see. He's an eight-year veteran and a seven-year at the VA police. I mean, these are not unmindful people. He had to pop the magazine or whatever, I think he calls it a magazine, to see that it isn't a firearm. I mean, you're right. Nobody got hurt here, but I look at it from this perspective. You're in the kiosk on the first floor of the Veterans Hospital in the city of Buffalo where you have a lot of people who have a lot of issues who have served the country, and they're there. It's hard. She's a person with a lot of issues who served the country also. Yes. I don't want to go extra record. Yes. Yes. She has a lot of issues, which, you know, both ways. Yeah. I mean, in the record, she's got seven plus years, you know, and she explains her response to it. I'm just saying that I guess if I can bring it back to, if I have just one second to run over, is that not one but two judges have looked at this beforehand and really thoughtfully evaluated the proof. They didn't give short shrift. They understood. To look at it from the perspective of the benefit of the defendant, I get that. I'm not shying away from it, but you have to look at everything. I think Judge McCarthy really did a very good job, and he struggled with it, but he got to it. But this isn't a discretionary decision, is it? We reviewed De Novo the same way that Judge Arcaro did, who also didn't see it. But then Hidalgo comes out, and that would have been post all of this. It would have been May 2018 where the court looks at this, and there's some discussion about whether it's De Novo, whether it's abuse of discretion. There's a 2016 case. It slipped my head. I'm sorry. I cite it in my brief where you talk about where it's abuse of discretion. So you kind of go to it and then don't decide it. All right? Thank you. Thank you. Thank you, Ms. Baumgarten. Mr. Bagley, you've reserved two minutes for rebuttal. Thank you, Judge. Just a couple of points on that last issue, the De Novo review. We've addressed that in our brief, I think, quite thoroughly. I point this court to United States v. Copp with a K, which comes out explicitly that De Novo review is appropriate, especially in the context of a self-defense jury instruction. One other thing is just it is De Novo review, and so it doesn't frankly matter that two courts have already looked at this issue. But Judge McCarthy does note that he turned it over in his mind several times. I think, to your point, Judge, that if you do have to go back and look at the video a couple of times, if you do have to think about it and say, geez, was she coming after him, or what was said, and who said it, and when, if those kind of issues are percolating, then you ought to get the instruction. Did Judge McCarthy say those issues were percolating, or just that he was . . . Just that he was kind of racking his brain. When those issues are outstanding, and I think that they are, then you ought to get the instruction. I'll finish with that. Thank you, judges. Thank you both. We'll reserve decision.